[Cite as *In re J.P.*, 2024-Ohio-5781.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the matter of: [J.P.],                          :

    Appellant,                          :

                                              No. 23AP-292

[State of Ohio,                          :                          (C.P.C. No. 20JU-4158)

    Appellee].                          :                          (REGULAR CALENDAR)

---

D E C I S I O N

Rendered on December 10, 2024

---

**On brief:** [*Elizabeth Miller*], *Ohio Public Defender*, and *Timothy B. Hackett*, for appellant J.P. **Argued:** *Timothy B. Hackett*.

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee. **Argued:** *Paula M. Sawyers*.

---

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, J.

{¶ 1} Adjudicated delinquent, J.P., appeals the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch following that court's April 12, 2023 judgment overruling his objections to the magistrate's decision and committing J.P. to the custody of the Ohio Department of Youth Services ("DYS").

{¶ 2} On March 10, 2022, J.P. entered an admission and was adjudicated delinquent for one count of rape and one count of gross sexual imposition. The complaint affidavit alleged that:

> On April 1, 2020, Child victims B.V. and C.V. participated in Medical Forensic Interviews at the Center for Family Safety & Healing located at 655 E. Livingston Ave., Columbus, Ohio. During B.V.'s interview he stated a boy (later identified as [J.P.] by B.V. and C.V.'s mother) had performed fellatio on him on at least three (3) separate occasions.

> C.V. disclosed in her interview that a boy she identified as [J.P.]
> (later identified as [J.P.] by B.V. and C.V.'s mother) had placed
> his hand inside of her pants and onto her vagina skin on skin.

As part of the admission agreement the state deferred to the recommendations of the predispositional investigation and juvenile sex offender assessment for sentencing, and both recommended continued juvenile probation and treatment.

{¶ 3} After the filing of the complaint, J.P. was referred to FORUM Ohio for testing and competency evaluation, the findings of which were summarized in a September 4, 2020 report prepared by Jenna Wade Psy.D. J.P. was 16 years old at the time of the evaluation. Although J.P.'s biological parents split when he was approximately seven years old and he has a very distant relationship with his biological father, he lives with his mother T.J. and his mother's fiancé T.W. lives in the home with J.P. No abuse was reported in the home, and J.P. reported that he has good relationships with both his parents and with T.W. J.P. reported that he had a good childhood, although he reported being bullied until he was in eighth grade, and admitted to some fighting in school, impulsivity, quickness to anger, and occasional lack of remorse. J.P. did have some documented aggression in preschool and grade school, but it does not appear that this continued into middle school or high school. J.P.'s mother reported that he was diagnosed with ADHD, that he is "socially and emotionally immature," and that he is not as responsible as he should be for his age, because she could not "leave him alone for more than 2 hours." She also reported that "I see remorse, but it takes him a minute. He does apologize." Aside from the underlying allegations, there was no indication that J.P. had engaged in animal cruelty, deceitfulness, theft, gang involvement, or violated any other serious rules. J.P. has been on an IEP for speech/language therapy and ADHD since 2007. He has participated in extracurricular activities, and his scholastic progress has been essentially average. He had applied for work but had not obtained a job at the time of the evaluation.

{¶ 4} J.P. reported a history of watching pornography starting when he was 12, although he stated that when his mother found out she removed his internet access. Although he had female friends whom he reported he had "dated," he denied a history of sexual intercourse, voyeurism, or fetishes. Both J.P. and his mother denied that he had a history of substance use. He is on Vyvanse, an ADHD medication, and uses melatonin as a sleep aid; he also has asthma and uses an inhaler as needed. J.P. also had a history of

bedwetting until middle school.  He self-reported anxiety and depression, but denied any suicidal ideations.  He occasionally "bangs his head on the closet" when angry or frustrated, and although he reported that he started this in high school, his mother stated that he had been intermittently engaging in the behavior since preschool. Based on a search of juvenile records, these were his first charged offenses.  The evaluator described him as "friendly and polite * * * but anxious when discussing his charges."  Based on his MAYSI-2 results, the evaluator diagnosed him with "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct," and "Attention-Deficit / Hyperactivity Disorder, Predominantly Inattentive Presentation by history." Based on his CAST-MR results, he was deemed competent to proceed to trial.

{¶ 5}   Following the court's acceptance of his admission, J.P. was referred for a pre-disposition evaluation, which occurred on April 6, 2022. At the time of this evaluation J.P. was 18 years old and was a 12th grade student at Westerville South High School.  He reported that his goals for his education were to "get straight As, graduate then take a gap year to work and save money so I can go to college for culinary arts."  (May 12, 2022 Pre-Disposition Report, Summ. and Recommendations at 1.) His Ohio Youth Assessment System Dispositional Tool (OYAS) risk score is an 8, which placed him at low risk for recidivism.[1] *Id.*  When J.P. was asked to describe the offenses by the investigator, he stated the following:

> I put my mouth around one of the people's you know what 2-3 times. The other one I was hugging them, and I was touching their stomach and rubbing their back * * *. I was at a low point, but I really don't know I really wasn't thinking when I did it. It was because no girls wanted to go out with me, and I was sad and lonely, and I tried to distract myself with videogames and porn and I was watching that nasty stuff. I searched it after hearing about porn and it was interesting. I started watching it in 6th grade there was a lot of hormones and I feel sick to my stomach just thinking about it. It was just a bad time in my life, and it should have never happened. I didn't think about the consequences or know about them. After it happened my mom was talking to me talking about jail and crimes. I felt like I needed something and wasn't thinking about and when I realized that I should stop it was too late. I was using the stuff online and I was trying to use it to get a girlfriend and that's

---

[1] "Scoring for males is as follows: Low is 0-11, Moderate is 12-18, and High is 19-33." *Id.*

> how I got suspended * * *. [It was] my fault * * * I didn't have
> no plan or thinking about it I just did it.

*Id.* at 2-3. J.P. stated that did not realize he would be getting himself into trouble by committing this offense and he stated this was "definitely" a problem for him. When asked where he learned how to do this he stated, "watching porn and that was when everything went downhill." *Id.* at 3. He denied being under the influence of drugs or alcohol and stated that he did know the victim in his offense. He stated that victims were "traumatized," that "my parents don't talk with [the victims' parents] no more" * * * and that "I wish I never done it or if it had to be something, I wish it was normal," because as he looks back, he feels "like a monster, things like this should never happen." *Id.* at 3. He stated that he is "a Christian [and] I have been watching sermons and doing daily devotions and gaining my confidence back[.] I want to improve myself." *Id.* at 3.

{¶ 6} Neither J.P.'s mother nor her live-in fiancé T.W. have any criminal history except old traffic cases. According to the report, J.P.'s scholastic records indicate only one other high school incident on February 3, 2020, which is recorded as "sexual harassment"— J.P. explained that he "inappropriately touch[ed] people" when he was in the tenth grade, that he was suspended for it, and that this was the last discipline he received. *Id.* at 6-7. He identifies as a heterosexual male, and stated he did not have a girlfriend at the time of the investigation, that he was not sexually active, that he did not use protection, and that he has never been tested or treated for an STD. J.P.'s mother stated that J.P. once indicated he was inappropriately touched on the legs by a girl in middle school, and that this incident was reported. No other incidents of sexual abuse or sexual conduct were described. According to the predispositional investigation, J.P. was diagnosed with Autism Spectrum Disorder, ADHD, and Adjustment Disorder with anxiety in the course of his treatment with Mid-Ohio Psychological Services. Ultimately, the pre-dispositional report observes that J.P. "took full responsibility for his actions and roles in the offense," and the investigator "respectfully recommended that [J.P.] be placed on a term of JCES Supervision * * * follow all recommendations of the JSO assessment and continue to participate in treatment * * * [and] that [J.P.'s] online activity be closely monitored and that he submits all usernames and passwords to the JCES specialist." *Id.* at 1.

{¶ 7} On April 25, 2022, J.P. was assessed by Nationwide Children's Hospital Behavioral Health for a sex offender pre-classification report. That report stated:

[J.P.] reported knowing the victims as their parents were friends for a few years. [J.P.] shared that they would visit with them occasionally for gatherings. He is uncertain of how he started the behavior but shared that he performed fellatio on the male victim one day. [J.P.] indicated it was not planned, and he just asked the victim to come over to him and "I did it." He reported this occurred "two or three times." With the female victim, [J.P.] shared that he would go to her and start rubbing her back and stomach while they sat together. He indicated that she would leave, and this would cause him to stop. [J.P.] shared that he eventually stopped realizing it was wrong and should not be doing that. He stated, "l feel like a monster, and I try not to think about it." [J.P.] learned others were aware when his parents questioned him after receiving a call from the victim's mother. He described feeling shocked and embarrassed, and it felt like his "heart dropped" to his feet. [J.P.] expressed uncertainty at the time about how to explain his actions to his parents because he did not know himself. He feels this was upsetting for his mother. [J.P.] described accepting responsibility for his actions. He feels that the victims, their families, and his parents have been affected by his behaviors as it was "traumatizing" for them. He further explained how it affected his mother's relationship with her friend and could cause problems for the victims. [J.P.] also feels he was affected as he is now dealing with the court process, which is scary for him. [J.P.] feels his parents, attorney and current therapists are good supports for staying out of trouble.

[J.P.] started noticing an interest in sex around age 13, but he has not been sexually active. He learned about sex through talking with his family, friends and education at school. He has a history of watching pornography and shared that the last time was before learning of the offense. His first exposure was through peers in middle school. [J.P.] believes watching pornography started his interest in sex and thought females liked these behaviors. He has learned it is inappropriate to touch someone without permission or speak derogatorily to them. [J.P.] shared that he has been in trouble in the past for inappropriately touching females and making sexual remarks while at school, resulting in a suspension. [J.P.] historically engaged in masturbation but shared that he does not like it. He experiences sexual thoughts, such as sexual activity with a female, but he does not feel it is frequent. He denied experiencing thoughts of a deviant nature or engaging in other deviant sexual behaviors.

(May 26, 2022 Behavioral Health Assessment Summ. at 2-3.) J.P. received a total score of 10/56 on the Juvenile Sexual Offender Assessment Protocol II (J-SOAP II). *Id.* at 4. At the time of the behavioral health assessment, J.P. was participating in individual counseling through Mid-Ohio Psychological Services and was receiving services through Opportunities for Ohioans with Disabilities related to mood, juvenile sex offender topics, cognitive abilities, and overall function. The evaluator agreed with his diagnosis of ADHD, Combined Type, and concluded that J.P. was:

> in an appropriate level of care and [should] maintain[] his current treatment services and goals, including but not limited to his JSO-specific treatment, individual counseling, and medication management. [J.P] should maintain his current school plan. He is employed and currently participates in several prosocial activities such as the career center and organized sports. This clinician recommends that [J.P.] maintain these activities and discuss with his ongoing providers if problems arise with his plan.

*Id.* at 5.

{¶ 8} The case was set for dispositional hearing before Magistrate Plair on May 21, 2022, and at that time, the magistrate committed J.P. to DYS in an order filed July 8, 2022. The magistrate observed:

> I wish I could say I understood the ends and outs of autism better than I do, but I'm not a medical professional here. I do understand enough to know that it affects the way that he takes in information, and the same thing that you would think was appropriate may not necessarily be what he thinks is appropriate in a given social setting. With that being said, Mr. Liston, I'm finding it hard to believe that the young man that stood up and gave that eloquent speech here, read that nice letter, gave the apologies to the family, would take a look at the 2 young kids that I saw in those pictures and think it was ever okay to give that kid a blow job for 2 years, off and on. I can't - - I can't fathom how he would have ever thought that was okay, even if he was watching porn, unless he was watching kiddie porn, there's nobody in pornographic materials that would even exhibit anything close to what I saw in those pictures and the young age and the young nature of those kids. I can't get past it. I understand what the recommendation is here today from both -- both JCES, and it appears as if both counsel are asking me for it, but I am not going to do that here today. Because of the severity of the offense, because of the young age of these children, because of the consequences that I have seen

that have come out of it, the Court is going to commit this young man to the Department of Youth Services for a minimum time of 1 year.

[T.J.]: No. No. No. No.

ATTORNEY LISTON: Can I ask the Court to delay disposition for me to file an objection (inaudible)? Would you so do so?

MAGISTRATE PLAIR: I will.

ATTORNEY LISTON: I'll ask you to issue a written finding (inaudible) taking the steps, thank you.

MAGISTRATE PLAIR: I'm going to reiterate that this was a very, very difficult decision for me. And I do understand that here in Franklin County we do make to rehabilitate, but I -- I think that the facts of the situation have to be taken into consideration, and here it just doesn't make any sense. I don't see any young man, unless he is severely, severely unable to think for himself, and I have not heard a doctor give any opinion as to chat regard up until this point, is able to understand when you see a young boy that is -- that is not what you should be doing in any instance. I will delay the enforcement of this sentence until you had -- had an opportunity to go ahead and take your objections up to the Judge. You have to understand, cases in the juvenile system are heard by Magistrates and we have bosses that we answer to. Bosses have policies, but the law in the state of Ohio is not decided by the people who wear these robes, it's the people that are sitting across -- down the street in the state legislature. So, if you really want to see change happen that is where you need to go, cause (sic) the Judge is gonna (sic) do what the Judge feels he should do given what the law is in this state, and I am attempting to do that as well. I just feel that this was egregious enough that it warrants more than simply a period of JCES in this particular matter. I will file my written findings of Facts and Conclusions in this particular case, and you'll also probably get that -- that separate sheet that they ask me to file, the addendum to the Magistrate's decision, that will go up as well to the Judge and it will go from there. So, this is what's going to happen, either the Judge is going to agree with what I said and the sentence will stand and then it will be enforced, or it's going to get overturned, and we'll be looking at something different. Okay? As far as the power that I have here today that is what I want to see happen. Do you have anything additional that you would like to place on the record this afternoon?

ATTORNEY KNAPP: Thank you, Your Honor, Just with regard to the Court's decision to commit [J.P.] to the Department of Youth Services, registration that is mandatory, can be delayed until either his successful termination from the Department of Youth Services, or if we're back before the Court on a -- another sentencing disposition. So, we don't need to do any registration stuff today with the Court's decision to impose DYS.

(May 31, 2022 Tr. at 46-49.)

{¶ 9}  J.P. filed objections, the magistrate filed findings of fact and conclusions of law on October 20, 2022.  On December 21, 2022 the trial court sustained his objections, vacated the magistrate's decision, and remanded the case to the magistrate, observing that several documents referenced in the presentence report—including a July 2020 psychological evaluation, J.P.'s counseling treatment records, and a letter from the state awarding J.P. autism disability services—were not actually provided to the magistrate: "In many cases, a summary contained in the PSI report may be sufficient for the Magistrate to make a decision regarding disposition. In this matter, the documents provided to the probation department were directly related to the Minor Child's mitigation factors. The Magistrate should have been given the opportunity to review and rely upon all mitigating documents at the time of the dispositional decision." (Dec. 21, 2022 Decision & Jgmt. Entry at 4-5.)  The trial court also disagreed with the magistrate's failure to find that there were mitigating factors, observing that "[u]pon review of the additional documents provided, this Court finds that mitigating factors are present in this case. It is possible that the Magistrate would as well upon review [of] the documents." *Id*. at 6.

{¶ 10} In accordance with the trial court's decision, the magistrate held a new dispositional hearing on January 24, 2023. And following that hearing, the magistrate again committed J.P. to DYS, and further immediately placed him in the custody of the Franklin County Juvenile Detention Center:

And -- and I'll say autism is a spectrum. You can be on one end of the spectrum, you can be in the middle, you can be on the end, it doesn't mean he doesn't have the ability to make decisions, such as the one.

I would say the fact that he told them not to tell indicates he knew what he was doing was wrong. So to say he wasn't able to evaluate this situation to at least know what he was doing shouldn't be told to the parents downstairs is the information

that I need to know that he knew what he was doing was wrong, he knew it. I don't have any doubt in my mind that he knew what he was doing was wrong. There was information that he wiped his browser history so you couldn't find porn that he was looking. He knew that viewing that pornography was wrong. I am not standing -- sitting here looking at somebody that doesn't have the ability to make basic human decisions that are decent. It doesn't take much to know that three-year-old should not be victimized in the way that he was victimized over and over again for a two-year period of time and the sister. Different sexes, non-gender specific, weaker people who could not physically and mentally say no the way he has been rejected in the past, that is the definition of a predator.

I am going to say that pursuant to Section 2152.01 (A) of the Ohio Revised Code the overriding purposes for dispositions under this chapter are to provide for the care, protection and mental and physical development of children subject to this chapter, that means I'm supposed to consider that he has an IEP for ADHD. I'm supposed to consider that he has an autism spectrum diagnosis, although I will say Dr. Hansen (phonetic) did indicate in his report that at the age of three, he did not display severe enough symptoms across the environment to warrant a diagnosis of autism or PDD and OS, nor of Asperger's Disorder. That teachers and counselors were able to observe him over the years and teachers do see him on a day-to-day basis and there was nothing ever expressed that would rise to the level of an autism diagnosis that would give mitigation enough for me to think that that is the reason why he committed the offense he did against this three-year-old. I don't think that the autism diagnosis mitigates his actions. I don't think that the IEP mitigates his actions. I don't think that the fact that he has now Opportunities for Ohioans with Disability, well, they say he is disabled in the areas of self-direction and interpersonal skills. I don't think that mitigates the actions that I saw happen here, I just don't.

* * *

I have concerns that he never looks in me in the face. When we're in court, he stares at the wall. He doesn't address me. He doesn't appear to be remorseful for his actions. The letter that he wrote for apology, it was written, it was typed. He stood up; he read the letter. I didn't see that he was remorseful when he read the letter. I don't know that he actually wrote that letter because it was typed, and I can't tell.

[T.J.]: He did it on his own.

MAGISTRATE PLAIR: He says that it affected his life in a major way. I don't see the major ways that his life had been affected. I see the major life affects that have resulted for this young man and this family and this young lady victim in the back of the room. I'm trying to do what I can to both do what's best for this young man and restore the victim, but I really don't think under the circumstances and given the severity of the actions here, that both are possible.

Rehabilitate the offender, I do think that he can get counseling. I think that he can get the same type of counseling he's getting now in DYS. So, sending him to DYS is not gonna prevent him from getting the type of counseling that he needs and there is no kid that is going to thrive in a locked down situation. No, I - - I don't think there's one person who we could say that they're gonna thrive in DYS. We place them there sometimes because it's in the best interest of the community because we've tried other things or maybe the actions are just so severe that that is what deem is in the best interest of the Franklin County community.

There's also something that says that I have to consider whether or not this demeans the seriousness of this offense and I would have to say to send a message to the Franklin County community that you could rape a three-year-old boy who hasn't developed mentally or physically for two years straight, having him trust you, lying to him, taking of advantage of him for two years while also doing the same to his sister when you're more than ten years older than him and the punishment that fits that crime, that situation, that act that he performed is probation with continued counseling that he set up himself. I'm sorry, I think that punishment demeans the seriousness of the offense. I don't believe that's what I am going to do here today. I am going to say and issuing the findings of—in this particular case, I have considered the credibility of the parties and the witnesses. I observed the demeanor of each witness, the interest of each witness and the outcome of this case and I gave weight to the factors of the Ohio Revised Code and the mitigating factors that were presented by counsel and by the defendant's family.

The Court's failure to state all the evidence and mitigating information in its findings is not an indication that I failed consider all of the evidence or all the mitigating factors. I did, and I -- I figured that the factors weighed more heavily toward what I am going to do in this case. I am going to commit [J.P.] to the Department of Youth Services for a minimum time of one

year on the count of rape, felony of the first degree. Because he is at this point in time is he 19, 20?

[T.J.]: He's 19.

MAGISTRATE PLAIR: When does he turn 20?

[T.J.]: September.

MAGISTRATE PLAIR: September?

[T.J.]: 20.

MAGISTRATE PLAIR: And we are getting dangerously close to the point in time where we don't even have one year left for them to hold him until he reaches the age of 21. I am going to enforce that today.

[T.J.]: What?

MAGISTRATE PLAIR: I am going to defer any kind of sex offender registration until he has completed his sentence at DYS.

PROSECUTOR KNAPP: Yes, Your Honor, that is correct.

COURT OFFICER: If you could stand up for me?

[J.P.]: Okay.

[T.J.]: Oh my, God.

ATTORNEY LISTON: Your Honor, just note our exception.

(Jan. 24, 2023 Tr. at 53-60.)

{¶ 11} J.P. again filed objections to that order, and his attorney filed supplemental objections following review of the transcript of the January 24 hearing. But this time, the trial court overruled his objections and adopted the magistrate's decision:

It is clear from the transcript of the hearing on January 24, 2023 that the Magistrate read the December 21, 2022 decision of this Court and then was given the opportunity to review and rely upon all mitigating documents available.

After reviewing the PSI, documents presented to the Court's Probation Department for the purposes of PSI, BHJJ Sexual Offender Assessment, arguments of counsel, mitigating information presented to the Court, and victim impact

statements, the Magistrate committed [J.P.] to the legal custody of the Department of Youth Services for initialization in a secure facility for an indefinite term consisting of a minimum period of one (1) year and a maximum period not to exceed [J.P.]'s attainment of the age of twenty-one (21) years.

This Court has carefully scrutinized the Minor Child's *Objection* and *Supplemental Objection*, heard oral arguments, read transcripts of proceedings, and conducted an independent assessment of the evidence with the applicable law. In doing so, this Court finds no error of law or fact in the Magistrate's Decision issued on February 1, 2023.

(Emphasis sic.) (Apr. 12, 2023 Decision & Jgmt. Entry at 2-3.) This appeal followed, and J.P. asserts four assignments of error that all challenge the validity of the disposition placing him in the custody of the DYS.

{¶ 12} Under R.C. 2152.16(A)(1)(d):

If a child is adjudicated a delinquent child for committing an act that would be a felony if committed by an adult, the juvenile court may commit the child to the legal custody of the department of youth services for secure confinement as follows: * * * [i]f the child is adjudicated a delinquent child for committing an act * * * that would be a felony of the first or second degree if committed by an adult, for an indefinite term consisting of a minimum period of one year and a maximum period not to exceed the child's attainment of twenty-one years of age.

{¶ 13} And in *In re D.W.*, 10th Dist. No. 19AP-221, 2019-Ohio-5259, this court held that juvenile dispositions must be " 'reasonably calculated to achieve the overriding purposes [of R.C. Chapter 2152],' which are 'to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender.' " *Id.* at ¶ 7, quoting R.C. 2152.01(A) and (B). But "[w]hile a juvenile court must consider those purposes, it has 'broad discretion to craft an appropriate disposition for a child adjudicated delinquent * * * [and the] court's disposition will be upheld unless there has been an abuse of discretion.' " *Id.* at ¶ 7, quoting *In re D.S.*, 111 Ohio St.3d 361, 2006-Ohio-5851, ¶ 6.

{¶ 14} On appeal, J.P. asserts the following assignments of error:

**Assignment of Error I:** The juvenile court clearly and convincingly violated R.C. 2152.01(A) and (B) and thus erred as a matter of law when it committed J.P. to DYS. The disposition is clearly and convincingly contrary to law and must be vacated.

**Assignment of Error II:** The juvenile court abused its discretion and erred as a matter of law when it committed J.P. to DYS because several of its key findings were unsupported by and contrary to the facts and evidence established by the record.

**Assignment of Error III:** The juvenile court abused its discretion when it committed J.P. to DYS because it arbitrarily rejected the recommendations of three separate professional evaluators and that of both parties, without providing a sufficient, fact-based reason for doing so.

**Assignment of Error IV:** The cumulative effect of the errors in this case deprived J.P. of a fundamentally fair disposition proceeding, in violation of J.P.'s due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 16 of the Ohio Constitution.

We will address each assignment of error in turn, and our review of each assignment of error is guided by the general principal that the trial court has the discretion to craft an appropriate disposition based on the facts of his case.

{¶ 15} In his first assignment of error, J.P. has identified certain "legal" errors that he argues are subject to *de novo* review: first, that the juvenile court violated R.C. 2152.01(A)'s graduated-sanctions mandate; second, that the juvenile court violated R.C. 2152.01(B)'s mandate that dispositions be consistent with other similar acts committed by similar delinquent children, and third, that the juvenile court exceeded its statutory authority when it relied on the adult sentencing factors of R.C. 2929.12 in support of its DYS commitment. A review of J.P.'s disposition records and the dispositional hearing transcript demonstrate that J.P.'s factual observations are correct—the juvenile court did not follow a "graduated sanctions" approach; rather, as J.P.'s merit brief observes, "J.P.'s trajectory was bedroom to cell block, without measured stops in between." (Brief of Appellant at 27.) And although defense counsel provided the court with certain statistical information about Franklin County dispositions for similar offenses—albeit information lacking specific factual detail as to those offenses—it appears that the magistrate did not

mention or consider that information in crafting its disposition. Finally, there is at least some discussion of the criminal sentencing statutes in the transcript, (*see* Jan. 24, 2023 Tr. at 40-41), in that magistrate's language regarding the "seriousness of the offense" appears to rely on factors drawn from R.C. 2929.12(B) and (C).

{¶ 16} In addressing these arguments, we must first address J.P.'s arguments regarding our standard of review of this assignment of error. J.P. argues that our review of legal errors is de novo, although he also contends that because of these alleged legal errors that his disposition is "clearly and convincingly contrary to law." The state has responded that J.P.'s first assignment of error should be reviewed for an abuse of discretion.

{¶ 17} The Supreme Court of Ohio recently made clear that pure errors of law are reviewed de novo:

> [A] court does not have discretion to misapply the law. A court has discretion to settle factual disputes or to manage its docket, for example, but it does not have discretion to apply the law incorrectly. That is why courts apply a de novo standard when reviewing issues of law. * * * We take this opportunity to make it clear that courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule.

*Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, ¶ 38-39. For purposes of analysis only, we will presume that J.P.'s first assignment of error challenges an "error of law" as described by the *Johnson* rule, and that it should therefore be reviewed under a de novo standard.

{¶ 18} J.P. first argues that R.C. 2152.01(A) establishes a "mandate" requiring the juvenile courts to impose graduated sanctions, and that because he has not previously had any juvenile cases, the juvenile court was precluded under that statute from committing him to DYS custody.

{¶ 19} This is simply incorrect. R.C. 2152.01 provides, in total:

> (A) The overriding purposes for dispositions under this chapter are to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the

offender. *These purposes shall be achieved by a system of graduated sanctions and services.*

(B) *Dispositions under this chapter shall be reasonably calculated to achieve the overriding purposes set forth in this section, commensurate with and not demeaning to the seriousness of the delinquent child's or the juvenile traffic offender's conduct and its impact on the victim*, and consistent with dispositions for similar acts committed by similar delinquent children and juvenile traffic offenders. The court shall not base the disposition on the race, ethnic background, gender, or religion of the delinquent child or juvenile traffic offender.

(C) To the extent they do not conflict with this chapter, the provisions of Chapter 2151. of the Revised Code apply to the proceedings under this chapter.

(Emphasis added.)  R.C. 2152.01.  The plain language of subsection A of the statute does not mandate the use of "graduated sanctions" in each individual case—rather, it requires the establishment of "a *system* of graduated sanctions and services" to be used in all juvenile cases, and the reason for this *system* is to achieve the overriding purposes of providing for the care, protection, and mental and physical development of children subject to this chapter, protecting the public interest and safety, holding the offender accountable for the offender's actions, restoring the victim, and rehabilitating the offender. Subsection B, meanwhile, presents language that must be used by trial courts in addressing individual cases, stating that "[d]ispositions under this chapter *shall be reasonably calculated to achieve the overriding purposes set forth in this section*," but also requiring that individual dispositions must be "commensurate with and not demeaning to the seriousness of the delinquent child's or the juvenile traffic offender's conduct and its impact on the victim, and consistent with dispositions for similar acts committed by similar delinquent children."

{¶ 20} In sum, section A of the statute describes the overarching purposes and structure of the juvenile disposition system, and section B proscribes how those purposes are to be fulfilled by individual dispositions.  J.P. has misinterpreted the statute to turn both subsections into mandates for individual dispositions.

{¶ 21} J.P. has not cited this court to any authority adopting his interpretation of R.C. 2152.01(A), and with good reason—his argument necessarily implies that first offenders can *never* be committed to the custody of DYS, no matter what the offense, since

under his interpretation such offenders will have never received a disposition of "a system of graduated sanctions and services." R.C. 2152.01(A). J.P.'s interpretation directly conflicts with other dispositional statutes in the juvenile code. *Compare id.* with R.C. 2152.16(A) (conferring discretion upon juvenile courts to commit children to the legal custody of the department of youth services upon an adjudication of delinquency "for an act that would be a felony if committed by an adult") and R.C. 2152.19(A)(8) (conferring authority upon the juvenile court to "[m]ake any further disposition that the court finds proper, except that the child shall not be placed in  * * * [any] place in which an adult convicted of a crime, under arrest, or charged with a crime is held.")  This hard-and-fast prohibition is simply not what the legislature intended when it established the juvenile courts or when it enacted this statute and is a misconstruction of the statute's plain language.  Had the legislature chosen to impose this one-size-fits-all-cases structure on all juvenile dispositions it could certainly have done so, but this statutory language clearly demonstrates the legislature made a different and less rigid choice.

{¶ 22} J.P.'s second and third arguments under his first assignment of error suffer from similar logical flaws. He asserts that the trial court committed legal error by failing to mention the statistical analysis of other dispositions that it had been provided by his counsel.  But while the disposition imposed on J.P. is undoubtedly an outlier amongst the other cases cited to the court, even by his own admission it is not totally unprecedented— at least three other juvenile offenders similarly situated to J.P. had been committed to DYS custody in the four-year period prior to his disposition.  The mere fact that most juvenile offenders similarly situated to J.P. were not committed to DYS cannot, standing alone, demonstrate that his disposition was improper, nor does the fact that all of the offenders committed to DYS were black necessarily establish that his disposition was based on "the race, ethnic background, gender, or religion of the delinquent child." R.C. 2152.01(B). J.P. does not point to any statement or direct evidence in the record to demonstrate either that his disposition was motivated racial bias or that it was plainly inconsistent with other dispositions imposed on similar facts.  Without such evidence, J.P. cannot establish a legal error that would require de novo review under the *Johnson* standard.  *See Johnson*, 2021-Ohio-3304 at ¶ 38-39.

{¶ 23} J.P. concludes the arguments under his first assignment of error by suggesting that the magistrate improperly relied upon factors that "mirror several of those set forth in R.C. 2929.12," an adult felony sentencing statute, in determining that J.P.'s conduct was more serious than that of other similarly situated juvenile offenders. But J.P. largely supports his argument here by citing to and quoting the magistrate's decision issued October 20, 2022, which was vacated by the trial court on December 21 of that same year. (*Compare* Dec. 21, 2022 Decision & Jgmt. Entry at 7 *with* Brief of Appellant at 31-35.) On remand, the magistrate was directed to hold a full dispositional hearing—she did so, and her subsequent recommendation of commitment to DYS, adopted by the trial court, did not specifically find any of the allegedly problematic "seriousness" factors to be present. (*See Generally* Jan. 24, 2023 Transcript; Jan. 24, 2023 Mag.'s Order to Hold or Release Juvenile; and Feb. 1, 2023 Addendum to Mag.'s Decision at 1-8.) Moreover, the objections that J.P.'s trial counsel filed to her decision made only a passing reference to the alleged "legal error" of which he now complains. (*See* Feb. 6, 2023 Obj. to Mag.'s Decision at 1-10 and Mar. 30, 2023 Supp. Obj. at 2. *Compare* with Juv.R. 40(D)(3)(b)(iv).) Instead, the magistrate's record justifications for the disposition made it very plain why she felt that DYS commitment was necessary—she believed that the facts presented showed that J.P. "knew what he was doing was wrong," that the vast age difference between J.P. and his younger victim demonstrated that his offenses were predatory, that the fact that J.P. repeatedly assaulted that victim over the course of two years indicated that J.P. lacked remorse for his actions, and the fact that the younger victim suffered from severe psychological distress as a result of the offense established that a disposition of confinement was required to at least partially restore the victim. The magistrate specifically stated that she was "trying to do what I can to both do what's best for this young man [J.P.] and restore the victim, *but I really don't think under the circumstances and given the severity of the actions here, that both are possible.*" (Emphasis added.) (Jan. 24, 2023 Tr. at 57.) She concluded that J.P. "still struggles [with] accountability for his actions, and still, at the age of 19, cannot be left alone unsupervised by his parents. His actions were predatory and he continues to be a danger to the community." (Feb. 1, 2023 Addendum to Mag.'s Decision at 1.)

{¶ 24} While it is certainly possible to disagree with the magistrate's interpretation of the testimony and evidence presented, her conclusion was in accordance with the dispositional statutes set forth in Chapter 2152 and cannot be said to be legal error. The trial court's decision in adopting that conclusion is likewise not legally erroneous. For all the foregoing reasons, J.P.'s first assignment of error lacks merit, and it is accordingly overruled.

{¶ 25} In his second and third assignments of error, J.P. contends that the trial court abused its discretion because its factual findings were not supported in the record and because it rejected the disposition recommendations of the mental health professionals, the state, and J.P. himself "without providing a sufficient, fact-based reason for doing so."

{¶ 26} Neither assignment of error has merit. It is true that the magistrate's focus on J.P.'s victims was paramount to its analysis, and it is also true that the parties and witnesses aside from the victims were comfortable with a less drastic disposition than confinement to DYS. But in both assignments of error, J.P. commits the same error for which he condemns the trial court—he prioritizes the evidence that supports his chosen outcome. There is absolutely evidence in the record supporting the trial court's conclusions that J.P. "knew what he was doing was wrong," that his offenses were predatory, that he struggled with accountability for his actions, and that his victims suffered from severe distress as a result of his actions. While upon a de novo review of the evidence this court might not conclude that J.P. continued to be a danger to the community or that addressing the harm caused to his victims outweighed the negative effects that DYS commitment could have upon him, such a review is well beyond this court's role. We must review the trial court's decision to adopt the magistrate's recommendation for an abuse of discretion, and that is as far as we may go. Whatever the failings of the magistrate's recommendation, the trial court's decision to adopt that recommendation is not an abuse of discretion. An abuse of discretion is more than an error of judgment—it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An abuse of discretion demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). We cannot substitute our judgment for that of the trial court, and accordingly we must overrule J.P.'s second and third assignments of error.

{¶ 27} Finally, we hold that J.P.'s fourth assignment of error also lacks merit. His argument in this assignment of error relies upon the "cumulative error" rule set forth in *State v. Fears,* 86 Ohio St.3d 329, 354 (1999) and *State v. De Marco*, 31 Ohio St.3d 191, (1987), paragraph two of the syllabus. Under the rule, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64 (1995).

{¶ 28} As J.P. suggests, the rule helps ensure that the proceedings comport with due process and fair treatment, which are the baseline requirements of juvenile procedure. *See generally In re Gault*, 387 U.S. 1, 37 (1967). But the rule does not affect his case, as it "does not apply to cases that are not marked by multiple instances of harmless error." *State v. Madden*, 10th Dist. No. 16AP-259, 2017-Ohio-8894, ¶ 57, quoting *State v. Banks*, 10th Dist. No. 03AP-1286, 2005-Ohio-1943, ¶ 23 (citing *Garner*). J.P. has not identified "multiple instances of harmless error" in his case—rather, we have held that he has failed to identify any error at all. And if there is no error in a case, there cannot be cumulative error.

{¶ 29} Accordingly, J.P.'s four assignments of error are overruled, and the decision and judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, is affirmed.

*Judgment affirmed.*

MENTEL, P.J., and LELAND, J., concur.

———————————