[Cite as *State v. Bansobeza*, 2025-Ohio-2704.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30294 |
| Appellee | : | |
| | : | Trial Court Case No. 2023 CR 02663 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| EZRA BANSOBEZA | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on August 1, 2025, the judgment of the trial court is affirmed in part, vacated in part, and reversed and remanded in part. Appellant's conviction on Count Seven is vacated. The judgment is reversed as to the sentence and remanded for resentencing, at which the trial court is to provide the notifications required by the Reagan Tokes Act, R.C. 2929.19(B)(2)(c). In all other respects, the judgment is affirmed.

Costs to be paid as follows: 50% by Appellant and 50% by Appellee.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

EPLEY, P.J., and HUFFMAN, J., concur.

**OPINION**
MONTGOMERY C.A. No. 30294

CHRISTOPHER BAZELEY, Attorney for Appellant
MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Defendant-Appellant, Ezra Bansobeza, appeals from his convictions on three counts of rape of a child under ten years of age, one count of attempted rape of a child under age ten, one count of attempted rape of a child under age 13, one count of attempted rape by force, six counts of gross sexual imposition, and two counts of kidnapping (sexual activity). According to Bansobeza, the trial court erred in the following ways: (1) it refused to let him present testimony of his law-abiding nature; (2) the kidnapping convictions were not supported by legally sufficient evidence; (3) cumulative error denied him a fair trial; and (4) the court erred in failing to advise him of his rights under the Reagan Tokes Act.

{¶ 2} The State has conceded error concerning the Reagan Tokes advisements, so we will consider only the first three alleged errors. Having reviewed the record, we conclude that the trial court did not abuse its discretion in refusing to admit evidence of Bansobeza's law-abiding nature, and no cumulative error denied Bansobeza the right to a fair trial. One kidnapping conviction (Count Seven) was not supported by sufficient evidence; that conviction will be vacated. Due to conceded error concerning the Reagan Tokes notifications, the case will also be reversed as to the sentencing and remanded for the trial court to provide proper notifications at resentencing. In all other respects, the judgment will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} In September 2023, Bansobeza was indicted on: three counts of rape of a child under the age of 10; one count of attempted rape of a child under the age of 10; two counts of gross sexual imposition ("GSI") of a child under the age of 13; and two counts of kidnapping. Other than the GSI indictments, the alleged offenses were first-degree felonies. Bansobeza pled not guilty, bail was set at $250,000 surety bond, and counsel was appointed. After bond was reduced to a surety bond of $100,000, with conditions of electronic monitoring and no contact with the alleged victims or minors, Bansobeza posted bond and was released from custody.

{¶ 4} In January 2024, a "B" indictment was filed, charging Bansobeza with seven additional crimes: one count of attempted rape of a person under 13 years of age and one count of attempted rape by force (both second-degree felonies); two counts of GSI of a person under 13 years of age and two counts of GSI by force (all third-degree felonies); and assault (a first-degree misdemeanor). Subsequently, the court set a jury trial to begin on September 16, 2024. In late August, Bansobeza filed a motion in limine seeking to exclude hearsay testimony, i.e., forensic interviews of the victims and testimony of the forensic interviewers. After holding a hearing on the matter, the court granted the motion in part and denied it in part. Decision, Order and Entry Denying in Part and Granting in Part Defendant's Motion in Limine to Exclude the State's Admission of Hearsay Testimony (Forensic Interview) ("Liminal Order") (Sept. 12, 2024).

{¶ 5} The trial began as scheduled on September 16, with the court having previously agreed to renumber the counts in the A and B indictments to Counts 1 through 14. (The State had dismissed the assault charge, leaving 14 counts.) After hearing the evidence, the jury found Bansobeza guilty on all counts. The court then set sentencing for October 9. For

purposes of sentencing, the court also renumbered the counts as they had originally been in the A and B indictments. *See* Order and Entry Renumbering Counts for Sentencing Purposes (Sept. 26, 2024). During sentencing, the court merged some convictions and sentenced Bansobeza as follows. Regarding the A indictment, on Counts One, Six, and Eight (rape of a child under the age of 10), the term was life in prison without the possibility of parole on each count, all to be served consecutively to one another; on Count Two (attempted rape of a child under 10), a term of 11 to 16.5 years to be served concurrently with the Count One sentence; Counts Three and Four (GSI), 60 months each, to be served concurrently with the Count One sentence; and Counts Five and Seven (kidnapping), 11 to 16.5 years each, to be served concurrently with Count One. Termination Entry (Oct. 18, 2024), p. 1-3.

{¶ 6} Concerning the B indictment, the court imposed the following sentences: B1 (attempted rape), eight to 12 years in prison to be served consecutively to the sentence on Count One of the A indictment; and B3 and B5 (GSI), 60 months in prison for each conviction, to be served concurrently with the sentence imposed for B1. *Id*. at 2-3. Thus, Bansobeza's total sentence was three consecutive terms of life in prison without the possibility of parole, plus a consecutive eight to 12 years in prison. In addition, the court imposed violent offender and sex offender registration requirements. Bansobeza timely appealed from the judgment.

## II. Admission of Evidence

{¶ 7} Bansobeza's first assignment of error states that:

The Trial Court Abused Its Discretion by Overruling Bansobeza's Motion to Present Evidence of His Law-abiding Nature.

{¶ 8} Under this assignment of error, Bansobeza contends the trial court erred in refusing to let his witnesses testify that he was a law-abiding person. He contends the trial court incorrectly concluded the testimony would be impermissible under R.C. 2907.02(D). According to Bansobeza, the court's order prejudiced him because he had no prior criminal record, was living in the United States as a refugee, and had an incentive to comply with criminal statutes in order to remain in the country. Bansobeza argues that if the jury had known about this, it would have carried great weight.

{¶ 9} In a filing shortly before trial, Bansobeza listed several fact/character witnesses, including the four witnesses (his daughters) who eventually testified and were the subject of the trial court's ruling. Bansobeza did not file a pretrial motion about these witnesses, but the matter came up at trial when the court let the defense call the daughters out of order because they would be unavailable after the day in question. Transcript of Proceedings (Jury Trial Days 2 and 3) ("Tr."), 262.[1] The court also allowed their testimony to be recorded so it could be presented later to the jury (which had already left for the day). Before the testimony began, the court remarked that Bansobeza had shared categories of testimony he wanted to present, which included opinions about "his peaceful or non-violent character, whether he is a moral person, and whether he treats children properly." *Id*. at 263. In addition, defense counsel wanted to ask whether Bansobeza was a "law- abiding citizen." *Id*. The court noted it had ruled out that category of testimony because of concern over whether it would violate the rape shield statute. *Id*.

---

[1] Four volumes of transcripts were transmitted to us, but only three are relevant here. They include testimony from a liminal hearing (incorrectly labeled on the transcript cover page as a "motion to suppress"), testimony from the jury trial, and the content of the sentencing hearing. Because the pages of these three volumes are numbered sequentially, we will refer to the three transcripts collectively as "Tr.," followed by the pertinent page number.

{¶ 10} The State objected to this character evidence based on the rape shield statute and also because the daughters' opinions were irrelevant and cumulative. The court then limited the testimony to the categories it had mentioned. The four daughters each testified that their father was a moral person, was not violent, was peaceful, and treated children appropriately. *Id*. at 266-281 (recording of videos) and 339-354 (recorded videos were played for the jury).

{¶ 11} We review decisions on admitting or excluding evidence for abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. This term "has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). Most abuses of discretion "will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* The court stressed in *AAAA Ents*. that "[a] decision is unreasonable if there is no sound reasoning process that would support that decision." *Id.* After reviewing the matter, we find no abuse of discretion.

{¶ 12} Under Evid.R. 404(A), "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion . . ." Certain exceptions are allowed. For example, an accused party may offer evidence of "a pertinent trait of character." Evid.R. 402(A)(1). Therefore, if a particular character trait were relevant here, Bansobeza would have been allowed to present evidence about it. Under Evid.R. 405(A), character evidence in such situations "may be made by testimony as to reputation or by testimony in the form of an opinion."

{¶ 13} Nonetheless, Evid.R. 404(A) further provides that "in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the

General Assembly are applicable." *Id*. One such exception is Ohio's rape-shield law, which "protects both the accuser and the defendant from the admission of evidence of prior sexual activity." *State v. Jeffries*, 2020-Ohio-1539, ¶ 14. This law is codified in R.C. 2907.02(D) and R.C. 2907.05(E), which pertain, respectively, to rape and gross sexual imposition. Both statutes contain the same provisions for excluding evidence. *Id*. As relevant here, R.C. 2907.02(D) provides that:

> Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or sexually transmitted disease or infection, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.[2]

{¶ 14} "Several legitimate state interests are advanced by the shield law. First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only

---

[2] During the time period of the alleged offenses, R.C. 2907.02 and R.C. 2907.05 were amended, respectively, to add the terms "sexually transmitted" and "or infection" to divisions (D) and (E). *See* Sub. H.B. 343, 2022 Ohio Laws 163, eff. Apr. 6, 2023. These additions are irrelevant here. The statutes were also amended again before the case was tried, but no changes were made to the relevant divisions. *See* H.B. 161, 2024 Ohio Laws 24, eff. Aug. 9, 2024.

marginally probative, the statute is intended to aid in the truth-finding process." *State v. Gardner*, 59 Ohio St.2d 14, 17-18 (1979).

{¶ 15} According to Bansobeza, the rape-shield statute is unambiguous and not applicable to evidence that is unrelated to sexual activity, such as whether he was a law-abiding citizen. In *Jeffries*, the Supreme Court of Ohio considered the defendant's argument that he had been wrongfully prohibited from introducing evidence of a victim's nonconsensual sexual activity. The court found that the term "sexual activity" as used in R.C. 2907.02 and 2907.05 is not ambiguous, and evidence of a victim's nonconsensual and consensual sexual activity would not be allowed into evidence. *Jeffries*, 2020-Ohio-1539, at ¶ 2 and 15-27. In particular, the court relied on the definition of "sexual activity" that is used for purposes of sections 2907.01 to 2907.38 of the Revised Code (which includes the rape-shield laws). *Id*. at ¶ 15-18.

{¶ 16} Specifically, R.C. 2907.01(C) defines "sexual activity" as "sexual conduct or sexual contact, or both." This statute also defines "sexual conduct" and "sexual contact" by reference to specific sexual acts like vaginal or anal intercourse, penetration by parts of the body or objects into the vaginal or anal opening, and touching various erogenous parts of the body. *See* R.C. 2907.01(A) and (B). Evidence concerning whether an individual is "law-abiding" does not fit within the defined categories of sexual activity. Consequently, we disagree with the trial court that the rape-shield law precluded Bansobeza from presenting evidence about whether he was "law-abiding." That is not the end of the matter, however.

{¶ 17} "The key to assessing the probative value of the excluded evidence is its relevancy to the matters as proof of which it is offered." *Gardner*, 59 Ohio St.2d at 18. Under Evid.R. 404(A)(1), "an accused may offer evidence of his good character or a pertinent trait thereof, such as peacefulness, in order to demonstrate that on the particular occasion

involving the charged offense he acted in conformity with his good character and did not commit the crime charged." *State v. Grubb*, 111 Ohio App.3d 277, 280 (2d Dist. 1996). However, "[o]ffering evidence of a person's character poses an inherent risk that the trier of fact will be distracted from the central issues in the case, and decide the case based upon the trier's attitude toward a person's character, rather than upon an objective evaluation of the operative facts." *Id*. at 280, citing Weissenberger, *Ohio Evidence*, § 404.4 (1996).

{¶ 18} The operative facts here, for example, involved whether Bansobeza engaged in sexual conduct with a person who was less than 13 years old, whether or not he knew the person's age. R.C. 2907.02(A)(1)(b) (rape). An additional element in this context was whether the victim was under the age of 10; in that case, the court had the option to sentence Bansobeza to life in prison without parole. *See* R.C. 2907.02(B). GSI involves the same type of facts but requires "sexual contact" with a person under the age of 13, rather than "sexual conduct." R.C. 2907.05(A)(4). The facts involved in kidnapping (because the victim was under 13) concerned whether Bansobeza, by any means, removed the victim from where she was found or restrained her liberty in order to engage in sexual activity against the victim's will. R.C. 2905.01(A)(4). None of these crimes required proof of force.

{¶ 19} One count of attempted rape and two GSI charges did involve force. As a result, character opinion as to Bansobeza's peaceful and non-violent nature would have been relevant and was admitted. To some extent, opinions that Bansobeza had a moral character and treated children well might be marginally relevant, since no person possessing such qualities would abuse children. From this perspective, however, whether Bansobeza was a law-abiding citizen was merely cumulative. The point had already been made, i.e., a moral person would also abide by the law. We note the allowed opinions also included statements that Bansobeza had "very good conduct," loved children, and treated them

nicely. Tr. at 277 and 281. We fail to see what mentioning that Bansobeza was law-abiding would have added. Consequently, while the trial court erred in excluding this evidence, any error was harmless.

{¶ 20} As a final point, while Bansobeza argues his status as a green-card holder and a refugee meant he would not violate any laws, he failed to provide any evidence about these facts (even if they were relevant, which they were not). The only evidence presented was that Bansobeza and his family came to the United States from Uganda in 2016. Two women who testified did say they were refugees from Uganda; one was related through marriage to Bansobeza's wife, and the other went to school in Uganda with his children. *Id*. at 74, 76, and 219-220. However, during testimony, nothing was said about Bansobeza's status as a green-card holder or refugee. The law is well-settled that we are limited to the record when considering direct appeals. "A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus. *Accord State v. Moore*, 2024-Ohio-2382, ¶ 12 (2d Dist.).

{¶ 21} Based on the preceding discussion, the first assignment of error is overruled.


### III. Legal Sufficiency

{¶ 22} The second assignment of error states that:

Bansobeza's Convictions for Kidnapping Are Not Supported by Legally Sufficient Evidence.

{¶ 23} Bansobeza challenges only his kidnapping convictions based on the sufficiency of the evidence. He contends the trial court violated his right to confrontation because the victim, G.M., to whom the kidnapping convictions related, did not appear for

trial. Instead, the State played parts of her forensic interview for the jury. Bansobeza acknowledges that forensic interviews are admissible but maintains that the parts relating to the kidnapping charges were not properly included because they did not relate to medical diagnosis and treatment. Based on the improper admission of this evidence, Bansobeza argues the kidnapping convictions were not supported by legally sufficient evidence.

{¶ 24} The kidnapping counts in question are original Counts Five and Seven (respectively relabeled as Counts 11 and 13 at trial and then returned to their original numbers in the final judgment entry). Count Five concerned a digital rape that occurred in an upstairs bedroom at Bansobeza's house, and Count Seven involved an anal rape that took place in the basement of the house. *See* Tr. at 384-385. At the end of the State's case and again at the end of trial, Bansobeza moved for acquittal on these counts under Crim.R. 29. The court overruled both motions.

{¶ 25} "When considering a Crim.R. 29 motion for acquittal, the trial court must construe the evidence in a light most favorable to the state and determine whether reasonable minds could reach different conclusions on whether the evidence proves each element of the offense charged beyond a reasonable doubt." *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist. 2000), citing *State v. Bridgeman*, 55 Ohio St.2d 261 (1978). "A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). Sufficiency is a question of law, and therefore our review is de novo. *Thompkins* at 386.

{¶ 26} "The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259 . . . : 'An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to

examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Hawn* at 471.

{¶ 27} In response to Bansobeza's argument, the State first contends the evidence was legally sufficient to sustain the convictions because, in reviewing for sufficiency, courts must include even evidence that was improperly admitted. State's Brief, p.9. We agree. In this situation, the Supreme Court of Ohio has said appellate courts "must consider all of the evidence that was admitted by the trial court, without consideration of whether any of that evidence should have been excluded." *State v. Blevins*, 2011-Ohio-381, ¶ 7 (2d Dist.), citing *State v. Brewer*, 2009-Ohio-593. (Other citations omitted.) This is because "the state may rely upon the trial court's evidentiary rulings in deciding how to present its case." *Brewer* at ¶ 19, citing *Lockhart v. Nelson*, 488 U.S. 33 (1988). In other words, the State should not be required to present duplicate testimony or evidence in anticipation of possible reversal on appeal.

{¶ 28} In *Lockhart*, the court explained that "a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary 'trial errors' as the 'incorrect receipt or rejection of evidence.' " *Lockhart* at 40, quoting *Burks v. United States*, 437 U.S. 14-16 (1978). "While the former is in effect a finding 'that the government has failed to prove its case' against the defendant, the latter 'implies nothing with respect to the guilt or innocence of the defendant,' but is simply 'a determination that [he] has been convicted through a judicial process which is defective in some fundamental respect.' " *Id.*, quoting *Burks* at 15. *Accord Brewer* at ¶ 18.

Consequently, we will include the challenged evidence in considering whether the State presented sufficient evidence to sustain the kidnapping convictions. In our review, we have considered the entire trial court record, including the forensic interviews.

{¶ 29} The charges against Bansobeza involved three victims: C.G., G.M., and L.Z. C.G. and L.Z. testified at trial; G.M. did not. The charges involving C.G. and G.M. were brought in the September 2023 indictment. Concerning C.G., the charges included one count of rape of a child under age 10; one count of attempted rape of a child under age 10; and two counts of GSI of a child under the age of 13. The charges involving G.M. included two counts of kidnapping (sexual activity) and two counts of rape of a child under age 10. The January 2024 indictment added six charges involving L.Z.: attempted rape of a child under the age of 13; attempted rape (force); two counts of GSI of a child under 13; and two counts of GSI (force).

{¶ 30} As background, the first victim, C.G., her mother, O.M., and her two brothers lived with Bansobeza and his family between November 2022 and March 23, 2023. After emigrating from Uganda in 2016, O.M. first went to Colorado, then to Kentucky, and ended up in Dayton, Ohio. O.M. was a friend of Bansobeza's daughter, who had offered for O.M. and her children to live with the Bansobeza family and receive babysitting services. About a month after arriving in Dayton, O.M. obtained a job at Sugarcreek Packing Company (where Bansobeza also worked), and she left the children, including C.G., in the care of Bansobeza's wife. O.M. worked from 3:55 p.m. to midnight, while Bansobeza worked mornings. Tr. at 74-79 and 87.

{¶ 31} During the time C.G. lived in Bansobeza's house, she was nine years old. About five months after her family moved out of the house, C.G. made allegations against Bansobeza, and she was evaluated for sexual abuse in the emergency room at Dayton

Children's Hospital on August 14, 2023. Subsequently, on August 16, Tori Ruhle conducted a forensic interview of C.G. at CARE House, which is a nationally accredited child advocacy center. Ruhle is a family services coordinator, works on a multi-disciplinary team that deals with child abuse, and helps coordinate services for children and families. During C.G.'s interview, C.G. made disclosures of a sexual nature about Bansobeza. *Id*. at 75, 103, 299-301, 305, 371, and 373. During trial, C.G. testified about sexual activity on several occasions, including when Bansobeza: (1) had touched her on her chest in the living room; (2) had pulled off her clothes and tried to insert his "private part" into her private part in the basement, but it did not fit; (3) put his fingers into her private part in the basement; and (4) sat on a couch in the basement, took off his pants, grabbed C.G.'s hand, and put it on his private part. *Id*. at 104-117.

{¶ 32} The second victim, G.M., was born in early June 2015 and was the child of M.L., who had come to the United States from the Congo. M.L. knew Bansobeza from Africa, as he had been her aunt's neighbor. Originally, M.L. came to Michigan and then moved with her four children to Dayton, Ohio. She reconnected with Bansobeza when he visited a family with whom she was living. At the time, M.L. was unemployed; Bansobeza's wife suggested that if M.L. got a job, she (the wife) could care for the children while M.L. worked. M.L. then obtained a job at Sugarcreek Packing Company working from 4:00 p.m. to 1:00 a.m., and she left her children at the Bansobeza house while she worked. G.M. was at the Bansobeza house from May 2023 to August 2023. On August 23, 2023, Ruhle conducted a forensic interview of G.M. at CARE House. G.M. had alleged that Bansobeza had done something wrong a week earlier while G.M. was at his house. During the interview, G.M. made disclosures of a sexual nature, alleging anal and genital contact. As a result, Ruhle referred G.M. to the CARE clinic and to mental health services through CARE House. At the CARE

clinic, a nurse practitioner, April Denlinger, performed a genital and anal examination. *Id*. at 158-159, 176, 285-290, 292-293, 305-306, and 319.

{¶ 33} The State played about five minutes of G.M.'s forensic interview at trial. G.M. was eight years old at the time of the interview. *Id*. at 311. During the interview, G.M. stated that Bansobeza had pulled her upstairs, taken off her pants, and touched her in the "weird place." She further said Bansobeza had held her by the hand "so, so hard" when going upstairs, and she could not move because her hand was hurting. In addition, she stated that Bansobeza had put his finger inside her in the "weird place" and swirled his finger around. State's Ex. 22, G.M. Interview, 00:03 - 00:52 and 01:12 - 02:05. She also said that, at another time, Bansobeza had taken her into the basement, pulled off her pants, taken off his pants, spread her legs, and put his "thing" in her butt. *Id*. at 00:22 - 00:27 and 02:06 - 04:59.[3]

{¶ 34} As indicated, a "B" indictment was filed in January 2024; it added charges related to a third victim, L.Z., who was the daughter of J.T., a refugee from Uganda. J.T. was related to Bansobeza by marriage; her husband and Bansobeza's wife had the same father. After arriving in the United States, J.T. first went to Arizona and then moved to Dayton, arriving before Bansobeza did, as he had settled first in Colorado. When Bansobeza came to Dayton, he lived with J.T. for a few months and then obtained other housing. J.T.'s other children and L.Z. visited the Bansobeza house with their mother and also went there when J.T. was working. L.Z. called Bansobeza "uncle." Tr. at 219-220, 222-226, and 240.

{¶ 35} In October 2023, L.Z. made comments during class that caused her teacher to take her to the school nurse. L.Z. then made statements that the nurse, as a mandatory

---

[3] While the children did not use anatomical words like "penis," their descriptions clearly indicated that Bansobeza used that part of his body as well as his fingers to inappropriately touch their genital areas.

reporter, had to report. The statements included that an "uncle" had touched her. On October 26, 2023, L.Z. was interviewed at CARE House, where she made disclosures of a sexual nature. Ruhle then referred L.Z. to CARE clinic for medical evaluation. *Id.* at 189, 197-198, 200, 230, 305, 307, and 322.

{¶ 36} At trial, L.Z. testified that when she and a cousin were in the basement of Bansobeza's house, he came downstairs, told her he needed her help with something, and sent the cousin upstairs. Bansobeza then started removing both their clothes and tried to rape her. She escaped by pushing Bansobeza and biting his hand. *Id*. at 240 and 249-252. L.Z.'s forensic interview, which was played in court, included additional details about body parts that Bansobeza had touched, including her vagina and butt. Ex. 22, L.Z. Interview, 00:16 - 00:27 and 00:53 - 02:43.

{¶ 37} As relevant here, kidnapping (sexual activity) occurs when a person, "in the case of a victim under the age of thirteen . . . shall remove another from the place where the other person is found or restrain the liberty of the other person . . . [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will." R.C. 2905.01(A)(4). Sexual activity has already been defined, and Bansobeza's actions clearly fit within that definition. G.M. was also only eight years old at the time. "Removing an individual from the place where he or she is found means changing the individual's location." *State v. Turner*, 2024-Ohio-684, ¶ 53 (2d Dist.), citing Ohio Jury Instructions, CR Section 505.01(A) (Rev. Nov. 2023). "The removal 'need not be for any specific distance or duration of time or in any specific manner.' " *Id*., quoting *State v. Sanders*, 2000 WL 377505, *3-4 (8th Dist. Apr. 13, 2000). Clearly, Bansobeza removed G.M. from the place she was found and changed her location.

{¶ 38} Thus, if the content of the forensic interview is included, sufficient evidence

existed to convict Bansobeza on both kidnapping counts. But Bansobeza's real argument is that the trial court violated the Confrontation Clause by admitting G.M.'s forensic interview and that its admission was prejudicial.

{¶ 39} Under the Sixth Amendment's Confrontation Clause, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The United States Supreme Court has "held that this bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004), citing *Pointer v. Texas*, 380 U.S. 400, 406 (1965). Ohio's interpretation of Article I, Section 10 of the Ohio Constitution parallels the federal interpretation, and Ohio's Constitution "provides no greater right of confrontation than the Sixth Amendment." *State v. Self*, 56 Ohio St.3d 73, 79 (1990). *Accord State v. Arnold*, 2010-Ohio-2742, ¶ 12. "The Confrontation Clauses were written into our Constitutions '*to secure for the opponent the opportunity of cross-examination.*' " (Emphasis in original.) *Self* at 76, quoting 5 Wigmore, *Evidence*, § 1395, at 150 (Chadbourn Rev. 1974).

{¶ 40} While we ordinarily review hearsay rulings for abuse of discretion, evidentiary rulings implicating the Confrontation Clause are subject to de novo review. *State v. McKelton*, 2016-Ohio-5735, ¶ 97, citing *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010). *Accord State v. McNeal*, 2019-Ohio-2941, ¶ 31 (2d Dist.). De novo review is independent and does not defer to trial court decisions. *State v. Clay*, 2016-Ohio-424, ¶ 5 (2d Dist.). However, "[a] constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 2006-Ohio-791, ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24 (1967). "Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that

the evidence complained of might have contributed to the conviction." *Id*., citing *Chapman* at 23. (Other citation omitted.)

{¶ 41} Concerning forensic interviews of child sexual abuse victims at child advocacy centers, the Supreme Court of Ohio has noted that "the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim. The interviewer acts as an agent of each member of the multidisciplinary team." *Arnold* at ¶ 33. There is no disagreement here that "statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause." *Id*. at ¶ 2. Bansobeza's position, however, is that G.M.'s statements about being taken upstairs or to the basement were not related to medical diagnosis and treatment but were more like other statements we have held to be testimonial and, therefore, inadmissible.

{¶ 42} Before trial, the court held a liminal hearing on the admissibility of the CARE House forensic interviews. Tr. at 4-58. During this hearing, the State presented testimony from Ruhle, who also testified at trial. Ruhle explained in detail what CARE House is and what protocols and procedures it follows in all cases. In addition, she discussed the specific interviews involved in the current case, including referrals that she made after the interviews. *Id*. at 5-48. The trial court also questioned Ruhle and admitted State's Ex. 1 (a flash drive of the interviews, which was later admitted at trial as State's Ex. 22). *Id.* at 45-46 and 48-49.

{¶ 43} After the parties presented arguments on their respective positions, the court commented that it had reviewed the videos and found them admissible. However, the court did stress its concern over some parts, which, while relevant to medical diagnosis and treatment, contained hearsay that would need to be redacted. Other parts did not relate to

medical diagnosis and treatment and would also need to be redacted. The court therefore ordered the State to redact those parts. *Id*. at 52-58. Following the hearing, the State identified the parts of the interviews it intended to use, and the court found, after review, that the video clips fully complied with *Arnold*. Liminal Order at p. 1, citing *Arnold*, 2010-Ohio-2742, at ¶ 44. As noted, the part of C.M.'s video that was allowed was about five minutes long. The full length of the video is not listed, but the last segment the State asked to admit (and that the court admitted) was from 29:10 to 29:53. *Id*. The part of the video that was admitted, therefore, was quite brief.

{¶ 44} During trial, Ruhle testified, as she had during the liminal hearing, about protocols and procedures used in interviewing children at CARE House. Tr. at 299-305. The interviews occur in a room containing only the interviewer and child, are recorded, and are observed by various individuals in a separate room. These individuals may include law enforcement personnel, children services' caseworkers, and victim advocates from the prosecutor's office. When children make sexual disclosures, Ruhle's job is to assess them for medical and mental health needs and to make appropriate referrals that are available to families or caregivers. After the interview, Ruhle also makes referrals to CARE House's child advocacy clinic for a CARE clinic exam. *Id.* at 307-308.

{¶ 45} Specifically regarding G.M., the people present in the observation room were Detective Sulek, Eve Wojtowica from Montgomery County Children Services, and Ashlee Knife, a victim advocate. Before conducting the interview, Rulhe had access to background information from a police report and a children services' referral. *Id*. at 306 and 317.

{¶ 46} Before G.M.'s video interview was played at trial, the defense again objected, and the court overruled the objection, finding the evidence non-testimonial and additionally admissible under a hearsay exception. *Id*. The State then played the video for the jury. *Id*.

at 310-311. As noted, during this excerpt, G.M. made sexual disclosures about Bansobeza. G.M. had not seen a doctor before the interview, and Ruhle made a referral to the CARE clinic afterward, where G.M. received an anal and genital exam. *Id*. at 158-159, 176, 308, and 318-319.

{¶ 47} In *Arnold*, the court noted that, in child advocacy centers, most members of the interdisciplinary team "retain their autonomy. Neither police officers nor medical personnel become agents of the other. However, to ensure that the child victim goes through only one interview, the interviewer must elicit as much information from the child as possible in a single interview and must gather the information needed by each team member." *Arnold*, 2010-Ohio-2742, at ¶ 33. Because a dual purpose exists, "[t]he interviewer acts as an agent of each member of the multidisciplinary team." *Id*. Consequently, when Ruhle interviewed G.M., she was acting as an agent of the police as well as other team members, including the nurse practitioner who ultimately examined G.M.

{¶ 48} As part of its discussion in *Arnold*, the court described certain matters that were clearly for forensic or investigative purposes. These included: the defendant's actions in shutting and locking the door of the room before raping the victim; descriptions of the defendant's clothing before it was removed; descriptions of locations of other people at the time, and so on. *Id*. at ¶ 34. Since *Arnold* was decided, we also have said that facts like "the physical location of the abuse and the layout of the house, the presence of anyone else, what [the defendant] said or sounds he made while performing sex acts, and whether [the victim] was asleep all appear to have been elicited and made primarily for investigatory purposes . . . [and] were not reasonably necessary for medical diagnosis or treatment." *State v. Moore*, 2019-Ohio-1671, ¶ 30 (2d Dist.). *See also State v. Curtiss*, 2022-Ohio-146, ¶ 107 (2d Dist.) (finding certain facts elicited from the victim's sibling (who did not testify at trial)

were unrelated to the sibling's own medical diagnosis. These included: (1) the defendant's wife was not home when the abuse occurred; (2) the victim's clothes were in a basket; (3) where the victim and defendant were located; and (4) the sibling's statement that the children should be taken away from the defendant.

{¶ 49} "*Arnold* places statements about who did what, in what manner, to whom in these contexts in the category of statements made for medical diagnosis and treatment, . . . and such statements elicited during the [child advocacy center] interview process therefore are not 'hearsay without exception' under Ohio law." *State v. C.C.B.*, 2019-Ohio-3631, ¶ 35 (10th Dist.), citing *Arnold*, 2010-Ohio-2742. "They fall instead under the evidentiary rule hearsay exception for '[s]tatements made for purposes of medical diagnosis or treatment and describing . . . past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.' " *Id.*, quoting Evid.R. 803(4). Notably, "no finding of unavailability is necessary when a statement is admitted pursuant to Evid.R. 803(4), because the rule itself provides that availability of the declarant is immaterial." *State v. Dever*, 64 Ohio St.3d 401, 414 (1992). *Accord State v. Muttart*, 2007-Ohio-5267, ¶ 46-47; *In re C.B.*, 2025-Ohio-1361, ¶ 5 and 34-37 (5th Dist.); and *Curtiss*, 2022-Ohio-146, at ¶ 136.

{¶ 50} According to Bansobeza, the statements in question were G.M.'s statements that Bansobeza "pulled her into rooms on two occasions before engaging in sexual activity." Appellant's Brief, p. 4. As indicated, to establish kidnapping in the context of persons under age 13, the State must prove first that the defendant removed "another from the place where the other person is found" or restrained "the liberty of the other person." R.C. 2905.01(A). The second requirement is that the purpose of doing so is "to engage in sexual activity . . . against the victim's will." Bansobeza has not argued that statements in the video about the

second requirement were testimonial. Clearly they were not, as in both situations, G.M. discussed parts of her body that were touched inappropriately and talked about pain she felt afterward due to the sexual assaults. State's Ex. 22, G.M., at 01:56 - 02:03 and 2:05 - 02:17.

{¶ 51} Having reviewed the evidence, we find that G.M.'s statement about being pulled upstairs was non-testimonial because it related to medical diagnosis and treatment. Specifically, G.M. said that when Bansobeza pulled her upstairs, he grabbed her hand so hard that she could not move because it hurt. This fell within the category of past or present pain and was reasonably pertinent to medical diagnosis or treatment.

{¶ 52} The second kidnapping situation involved Bansobeza's taking G.M. to the basement. This was all G.M. said about the removal, i.e., that Bansobeza "took" her to the basement. As a result, this statement did not pertain to medical diagnosis or treatment.

{¶ 53} Where an interviewer is acting as a police agent for purposes of eliciting statements unrelated to medical diagnosis, the court must "employ the primary-purpose test to determine whether the primary purpose of the interrogation was ' "to enable police assistance to meet an ongoing emergency." ' " *Arnold*, 2010-Ohio-2742, at ¶ 35, quoting *State v. Siler*, 2007-Ohio-5637, paragraph one of the syllabus, quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006). Here, there was no emergency. As in *Arnold*, the event occurred in the past (a week before the interview), and "a reasonable observer would not perceive an ongoing emergency at the time of questioning." *Id*. Furthermore, "the questioning was not objectively necessary to resolve an emergency because there was no ongoing emergency." *Id*. The evidence that Bansobeza took G.M. to the basement, therefore, was admitted in violation of the Confrontation Clause.

{¶ 54} Nonetheless, that does not mean the kidnapping conviction on Count Seven must be reversed. As indicated, where a Sixth Amendment violation occurs, "the question is

whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Conway*, 2006-Ohio-791, at ¶ 78, citing *Chapman*, 386 U.S. at 23. Here, as Bansobeza points out, G.M.'s statement about being taken into the basement was the only evidence that supported the first element of kidnapping. Without that testimony, the crime of kidnapping could not have been established. Clearly, there was sufficient evidence to support the purpose of engaging in sexual activity (the anal rape), but the element of removal was not established. In this regard, we stress that the State, in its bill of particulars, did not rely on a restraint of liberty; it specified only that Bansobeza "on two distinct occasions physically pulled G.M. by the wrist or other body part, into the basement of his residence, with purpose of engaging in sexual activity." Bill of Particulars (June 24, 2024), p. 4. An amended bill of particulars corrected a few things, like indicating the removal was to two different places (one to the basement and the other to the upstairs), but otherwise the same content remained. Amended Bill of Particulars (Sept. 9, 2024), p. 4.

{¶ 55} In closing, the State also only argued (in reference to this count) that Bansobeza had "grabbed" G.M. and had "physically pulled her into another room in the house." Tr. at 385. This was actually incorrect; G.M. only said in the interview that Bansobeza "took" her to the basement. Accordingly, we have only considered movement to a place other than where G.M. was originally found (not restraint).

{¶ 56} Again, sufficient evidence existed for this kidnapping conviction if we included the challenged testimony. In the current context, however, we are only deciding if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Conway*, 2006-Ohio-791, at ¶ 78. Here, we must conclude that it might have contributed.

{¶ 57} In light of the above discussion, the second assignment of error is overruled in

part and is sustained in part. Bansobeza's conviction on Count Seven only was supported by insufficient evidence.

### IV. Cumulative Error

**{¶ 58}** The third assignment of error states that:

The Cumulative Effect of the Trial Court's Errors at Trial Resulted in Denying Bansobeza's Right to a Fair Trial.

**{¶ 59}** Under this assignment of error, Bansobeza argues that even if we find that the previous alleged errors did not violate his right to a fair trial, the cumulative effect of these errors, along with three other evidentiary errors, demonstrates that he was prejudicially denied the right to a fair trial. In response, the State discusses the three alleged errors, contending there was no abuse of discretion in the trial court's evidentiary decisions.

**{¶ 60}** Before we address the merits of Bansobeza's argument, we note that the State has asserted an incorrect standard for abuse of discretion, arguing that it is defined as " 'more than an error of law.' " State's Brief at p. 13. Contrary to this assertion, the Supreme Court of Ohio has stressed that: " 'No court – not a trial court, not an appellate court, nor even a supreme court – has the authority, within its discretion, to commit an error of law.' " *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38, quoting *State v. Boles*, 2010-Ohio-278, ¶ 16 (2d Dist.) In *Johnson*, the court further stressed "[t]his should be axiomatic: a court does not have discretion to misapply the law." *Id*.

**{¶ 61}** *Boles* has been the view of this appellate district for about 15 years, and for the last several years, the Supreme Court of Ohio has explicitly agreed with our position. Furthermore, we have previously reminded the State that courts do not have discretion to commit errors of law. *See State v. Parks*, 2024-Ohio-5026, ¶ 99, fn. 4 (2d Dist.), citing *State*

*v. Pulley*, 2023-Ohio-3277, ¶ 52, fn. 1 (2d Dist.). *See also State v. Wroten*, 2023-Ohio-966, ¶ 16 (2d Dist.); *State v. Kocevar*, 2023-Ohio-1513, ¶ 24 (2d Dist.). If courts do commit errors of law, they are reviewed de novo. *E.g., State v. Trent*, 2025-Ohio-1278, ¶ 10 (2d Dist.); *In re J.P.*, 2024-Ohio-5781, ¶ 17 (10th Dist.).

{¶ 62} Turning to the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Hunter*, 2011-Ohio-6524, ¶ 132, citing *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "In order to find cumulative error, we first must find that multiple errors were committed at trial." *Id*.

{¶ 63} As a preliminary point, we have not found multiple instances of trial court error. We found one harmless error and partially sustained one assignment of error (relating to only one conviction out of 14). Our review of the remaining alleged evidentiary errors also does not reveal that Bansobeza was deprived of his right to a fair trial. We will consider each of Bansobeza's evidentiary issues separately.

A. Admission of O.M.'s Testimony

{¶ 64} The first alleged error relates to testimony of O.M., who was C.G.'s mother and lived with her three children in Bansobeza's house from November 2022 to March 23, 2023.

{¶ 65} Before trial, the State filed an Evid.R. 404(B) notice, indicating it intended to present evidence from the victims of a grooming process in order to establish the acts in question were not spur-of-the-moment decisions but were part of a larger scheme or plan. State's 404(B) Notice (Aug. 30, 2024), p. 1-2. The State also said it intended to present testimony from O.M. to the effect that part of the reason her family moved out of Bansobeza's

home was due to sexual advances Bansobeza was making toward O.M. According to the State, while O.M. did not claim this rose to the level of felony criminal prosecution, Bansobeza's "actions and words are a demonstrable reason that the family moved out of the Defendant's home." *Id*. at p. 2.

{¶ 66} At trial, the State asked O.M. why she had moved out of the house, and defense counsel objected based on Evid.R. 404(b). At that time, the State made a general statement that it was offering the evidence to establish the absence of mistake or accident, preparation, and opportunity. The trial court then overruled the objection. Tr. at 80-81. After that, O.M. testified that, when she obtained a job, she had wanted to move out, but Bansobeza's family said no, that she could stay with them. However, after a while, O.M. did not like Bansobeza's behavior, which included offering to buy her a nice car, helping her find a house, and even proposing that she could be his second wife. She did not like that, and this was why she did not want to stay in the same house. *Id*. at 82.

{¶ 67} At that point, the court provided the jury with a limiting instruction, stating that the evidence could not be used to show Bansobeza was a person of a certain character and that his actions were in accordance with that character. *Id*. The court said the evidence could be used, however, "for purposes of establishing opportunity, plan, or absence of mistake as it pertains to sexual overtures." *Id*. at 83.

{¶ 68} Evid.R. 404(B)(1) provides that "[e]vidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Permissible uses exist that let the evidence be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2).

**{¶ 69}** " 'This type of evidence is commonly referred to as "propensity evidence" because its purpose is to demonstrate that the accused has a propensity or proclivity to commit the crime in question.' " *State v. Echols*, 2024-Ohio-5088, ¶ 21, quoting *State v. Hartman*, 2020-Ohio-4440, ¶ 21. In our opinion, the evidence in question, i.e., that Bansobeza wished an adult woman to be a "second wife," does not show that he had a propensity to commit sexual crimes against children. Therefore, it was not propensity evidence at all. Furthermore, O.M. did not actually testify about sexual advances. We also believe the evidence was properly admitted to show opportunity or plan. Specifically, a plausible argument could be made that by buying O.M. gifts, assisting her in obtaining a house, and even offering to marry her, Bansobeza was attempting to maintain access to the victim (i.e., opportunity).

**{¶ 70}** The actions in question were also not criminal unless a formal marriage occurred (which did not happen). *See* R.C. 2919.01 (prohibiting a married person from marrying another and making the crime a first-degree misdemeanor). Nonetheless, the court remarked in *Echols* that the phrase "crime, wrong, or other act" "is most naturally read as encompassing acts that are 'wrongful in some way' or, to put it differently, 'reflect[ ] negatively on the character of the actor.' " *Id*. at ¶ 25, quoting Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events*, § 4.6, at 292 (2d Ed. 2019).

**{¶ 71}** For the sake of argument, we will assume the evidence reflected negatively on Bansobeza's character, as bigamy or polygamy is not legal in Ohio and other states, and the practice has not been given protection under the Free Exercise Clause of the First Amendment. *Cleveland v. United States*, 329 U.S. 14, 18 (1946), citing *Reynolds v. United States*, 98 U.S. 145, 164 (1878).

{¶ 72} In any event, "[t]he determination of whether other-acts evidence is admitted for a permissible purpose is a question of law, which we review de novo." *Echols,* 2024-Ohio-5088*,* at ¶ 30, citing *State v. Hartman*, 2020-Ohio-4440, ¶ 22. On the other hand, whether the court erred in failing to exclude other-acts evidence is reviewed for abuse of discretion. *Id*. at ¶ 39, citing *Hartman* at ¶ 30.

{¶ 73} The Supreme Court of Ohio has said that "courts should engage in a three-step analysis when determining whether 'other acts' evidence is admissible and consider: (1) whether the other-acts evidence is relevant under Evid.R. 401, i.e., whether it tends to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence; (2) whether the evidence is presented to prove a person's character in order to show that his conduct was in conformity therewith or whether it is presented for a legitimate other purpose, such as those stated in Evid.R. 404(B); and (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice under Evid.R. 403." *State v. Nicholson*, 2024-Ohio-604, ¶ 83, citing *State v. Williams*, 2012-Ohio-5695, ¶ 19-20.

{¶ 74} In *Echols*, the trial court failed to perform this analysis before allowing the testimony. *See Echols* at ¶ 40. That is true here as well. In this situation, the Supreme Court of Ohio commented that while "[t]he better practice would have been for" the trial court to do so, its own review was "directed at the ultimate admission of the evidence itself." *Id*. That is also our focus.

{¶ 75} As noted, "the real issue when Evid.R. 404(B) evidence is improperly admitted at trial is whether a defendant has suffered any prejudice as a result. If not, the error may be disregarded as harmless error." *State v. Morris*, 2014-Ohio-5052, ¶ 25. "The question is whether an improper admission affects the defendant's 'substantial rights' so that a new trial

is required as a remedy." *Id.* at ¶ 26.

**{¶ 76}** In *Morris*, the court "dispensed with the distinction between constitutional and nonconstitutional errors under Crim.R. 52(A)." *State v. Harris*, 2015-Ohio-166, ¶ 37, citing *Morris* at ¶ 22-24. "In its place, the following analysis was established to guide appellate courts in determining whether an error has affected the substantial rights of a defendant, thereby requiring a new trial." *Id*.

> First, it must be determined whether the defendant was prejudiced by the error,
> i.e., whether the error had an impact on the verdict. . . . Second, it must be
> determined whether the error was not harmless beyond a reasonable doubt.
> . . . Lastly, once the prejudicial evidence is excised, the remaining evidence is
> weighed to determine whether it establishes the defendant's guilt beyond a
> reasonable doubt.

*Harris* at ¶ 37, citing *Morris* at ¶ 25, 27, 28, 29, and 33. *Accord State v. Boaston*, 2020-Ohio-1061, ¶ 63.

**{¶ 77}** Having reviewed the record, we find that Bansobeza was not prejudiced by any potential error, and if any error occurred, it was harmless beyond a reasonable doubt. Finally, if we excise the challenged evidence, the remaining evidence demonstrated Bansobeza's guilt beyond a reasonable doubt. In this regard, we focus on several items. First of all, when the trial court admitted the evidence, it gave a limiting instruction. Tr. at 82-83. Second, the State did not refer again to the matter while examining any witnesses, nor did it mention it during closing argument. *See id.* at 381-385 and 400-409. And, in fact, the evidence in question involved a minor point.

**{¶ 78}** Furthermore, Bansobeza's position at trial was that he did not commit any inappropriate acts against the children and that the allegations were false. *Id.* at 71-72

(opening statement) and 387 (closing statement). To this end, Bansobeza relied on the absence of physical findings when the children were examined. *Id*. at 388 (discussing in closing argument that there was a "lack of physical evidence or DNA" and stating that "what the objective physical evidence in this case says is that the objective physical evidence proved Ezra Bansobeza not guilty beyond a reasonable doubt"). In addition, Bansobeza relied on the character testimony of his four adult daughters that he is a "moral man," "a peaceful man," "a nonviolent man," and "treats children properly." *Id*. at 399-400.

**{¶ 79}** Evid.R. 401(A)(1) allows defendants to present character evidence. Bansobeza did that here by presenting evidence from his daughters that he was a moral person. The State was allowed to rebut such evidence. *Id*. Evid.R. 405(A) permits the State to do so through specific instances. *See also State v. Potchik*, 2011-Ohio-501, ¶ 55 (2d Dist.) (noting that where a defendant introduces character evidence, that "would open the door to the State's inquiry into any specific acts of conduct of the accused to rebut that testimony of peacefulness, shyness and timidity. This evidence and method of cross-examination is permitted by Evid.R. 404(A)(1) and 405(A) and the trial court did not abuse its discretion in so ruling.")

**{¶ 80}** It is true that while this evidence would normally come in the form of rebuttal, the State actually presented O.M.'s testimony during its case in chief. However, in the context of the case at hand, the issue is whether the evidence itself was prejudicial or harmless beyond a reasonable doubt. Because Bansobeza presented evidence of his moral character, the State would inevitably and correctly have been allowed to present the evidence in question as rebuttal. Therefore, it is impossible to see how Bansobeza was prejudiced. The State could have recalled O.M. to restate what she had already said, but it would have been pointless to do so.

{¶ 81} As a final matter in this context, the evidence against Bansobeza was overwhelming. The State presented expert testimony from Dr. Joyce Miceli, a pediatric psychologist who has been providing therapy to children and families for 34 years. Dr. Miceli was familiar with the names of the children involved here, but did not treat them personally. However, she gave general testimony about child abuse. Dr. Miceli is part of the CARE House team and has often testified in court. She explained that research is clear that most disclosures of abuse do not occur immediately. About 30% of adults have never disclosed abuse, and most people are over 18 years old before they tell anyone. The doctor also explained that children's disclosures typically are not complete when they make them. Disclosures are also delayed because young children frequently do not know anything inappropriate has happened. Older children may be afraid they will get in trouble or that they have done something wrong. In addition, sometimes children have been threatened or worry that disclosure will split families apart. Tr. at 137-145.

{¶ 82} The sexual disclosures of C.G. and L.Z. occurred a matter of months after the alleged events; G.M. made disclosures about a week after the incidents. April Denlinger, a nurse practitioner at CARE clinic, examined all three girls. There was no dispute that their physical exams were normal, and testing for sexually transmitted diseases was negative. Evidence was not collected because that is only done in situations where the sexual assault occurred within the previous 72 hours (for children who haven't experienced puberty) and 96 hours (for those who have). *Id*. at 153, 155, 157, 159, 160, 164-166, 169, 172-177, 181, and 372-373. Denlinger testified that, based on literature and her experience, 97% of children who have experienced sexual abuse have normal exams. *Id*. at 161-162.

{¶ 83} During trial, the jury heard live testimony from two children and forensic interviews of all three children. The children all discussed Bansobeza's sexual abuse, the

period within which it occurred, where the abuse took place, and other relevant details. Again, Bansobeza's position was that there was a lack of physical evidence, that the children were fabricating, and that he, as a moral person who was non-violent and treated children well, would not have done such things. No evidence was presented to indicate the children were lying or even why they may have had a motive to do so. Accordingly, even if O.M.'s testimony were improperly admitted, there would be no reason to reverse the judgment on that basis.

**{¶ 84}** Finally, we reiterate that a plausible and relevant reason for admitting the evidence (although not well-articulated by the State in the trial court or in its brief) might have been that it helped establish Bansobeza's plan or attempt to maintain the opportunity to access C.G., one of his victims.

## B. Admission of Testimony from the School Nurse

**{¶ 85}** Bansobeza's second claim about evidence concerns testimony from L.Z.'s school nurse about the fact that L.Z. and a friend approached her with questions about pregnancy. Bansobeza contends this was prejudicial but fails to say why. His complaint is that the trial court did not let him argue his objection at sidebar. Appellant's Brief at p. 10.

**{¶ 86}** L.Z.'s teacher brought L.Z. and another student to the office of the school nurse (Kisha), based on comments they had made in her class. After taking to L.Z., Kisha, as a mandatory reporter, made a report. This occurred in October 2023. Tr. at 189-190. When L.Z. and her friend came to Kisha's office, they were debating reasons why kids get pregnant or things that could terminate a pregnancy. Kisha did not feel this was something that needed to be reported. However, L.Z. subsequently said something that Kisha was required to report. *Id*. at 198. When the defense objected to Kisha's testimony, the court asked the

attorneys to approach for a sidebar. *Id.*

{¶ 87} At that point, the court remarked that L.Z. had been talking to the school nurse about her physical condition, which would be admissible under Evid.R. 804(3) or (4). The court did not ask for responses from either the State or defense at that point; it simply overruled the objection. *Id.* at 198-199. Thus, neither party had an opportunity to speak.

{¶ 88} Kisha then testified that L.Z. had told her that she had taken a pregnancy test. There appears to have been confusion on L.Z.'s part about whether the test was L.Z.'s or her sister's and about how one can get pregnant. L.Z. said she had had an encounter at home and an uncle had touched her inappropriately. *Id.* at 199-202. This is what caused the nurse to make a mandatory report.

{¶ 89} Evid.R. 803 discusses exceptions to the hearsay rule, even when a declarant is available as a witness. As relevant here, Evid.R. 803(3) pertains to "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." Similarly, the exception in Evid.R. 803(4) pertains to "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

{¶ 90} Again, we review the trial court's evidentiary rulings for abuse of discretion. L.Z.'s statements clearly concerned her existing state of mind, mental feeling, and bodily health, and Bansobeza has provided no evidence otherwise. The statements made to the nurse were also reasonably pertinent to diagnosis and treatment. Accordingly, the trial

court's decision to admit the evidence was not an abuse of discretion.

### C. Testimony from Bansobeza's Neighbor

{¶ 91} The third challenged evidentiary decision involves testimony from a neighbor (Jocelyn) concerning L.Z.'s statement that Bansobeza was "touching her." Appellant's Brief at p. 11, citing Tr. at 213-214. According to Bansobeza, admitting this testimony was improper because it was hearsay and corroborated L.Z.'s account. Bansobeza also argues the trial court failed to give a reason for overruling his objections. *Id*.

{¶ 92} This latter point is incorrect. Before Jocelyn's testimony, the defense objected to her testimony as irrelevant, improper under Evid.R. 404(B), and prejudicial, as it would bring in potential uncharged allegations. *Id*. at 208. At a sidebar, the State said the witness was a next-door neighbor whose child played with L.Z., and the testimony would be about an excited utterance. The court overruled the objection. *Id*. Clearly, the court agreed with the State.

{¶ 93} Jocelyn testified that she lived next door to Bansobeza, that her daughter played with L.Z., and that she had interacted with L.Z. several times. She described L.Z.'s normal demeanor as a "happy kid," "a normal teenage little girl." However, in the summer of 2023, when Jocelyn had known L.Z. for a couple of months, L.Z.'s demeanor changed. At the time, Jocelyn worked late nights, often sat in her car when she got off work, and sometimes fell asleep. *Id*. at 209-213. On this particular occasion, Jocelyn was sitting in her car when L.Z. came outside to speak to Jocelyn's daughter. Jocelyn related that L.Z. "was crying a lot, really crying. Like something was really bad. Something really bad had happened." *Id*. at 213. When Jocelyn asked why she was crying, L.Z. said "she was upset because her grandfather was touching on her." *Id*. at 214. L.Z. also said "she thought that

was a shame because he's her grandfather." *Id*.

{¶ 94} During this testimony, defense counsel again objected, and the court overruled the objection. *Id*. at 213-214. Although the court did not comment on its reasons at that time, the State had already said it intended to present L.Z.'s statements as excited utterances. During cross-examination, defense counsel also asked the court to strike Jocelyn's testimony because L.Z. had not said when the event occurred and, thus, the statement did not meet requirements for an excited utterance. *Id*. at 215. The court again overruled the objection and specifically stated its reasons for finding a temporal nexus between the excited statement and the unwanted touching. *Id*. at 215-216. Contrary to his claim here, Bansobeza was aware of the court's reasons for admitting the evidence.

{¶ 95} As before, we review this evidentiary decision for abuse of discretion. Under Evid.R. 803(2), an excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Courts use the following four-part test to decide if statements should be admitted as excited utterances:

(a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination continued to remain sufficient to make his

statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

*State v. Jones*, 2012-Ohio-5677, ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus, *followed and approved in State v. Taylor*, 66 Ohio St.3d 295, fn. 2 (1993).

**{¶ 96}** "There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance." *Taylor* at 303. In *Taylor*, the court remarked that a "trend of liberalizing the requirements for an excited utterance when applied to young children who are the victims of sexual assault is also based on the recognition of their limited reflective powers." *Id*. at 304, citing *State v. Wallace*, 37 Ohio St.3d 87, 88 (1988), and *State v. Wagner*, 30 Ohio App.3d 261 (8th Dist.1986). Additionally, "each case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation." *State v. Duncan*, 53 Ohio St.2d 215, 219-220 (1978). Among the cases cited in *Duncan* was one where a six-year-old waited two weeks to relate details of a molestation. *Id*. at 220, citing *State v. McFall*, 75 S.D. 630, 633 (1955). "Where a young child claims to have been the victim of a sexual assault, the test for admission of the child's statements does not focus upon the progression of the startling event or occurrence, but upon the spontaneous nature of the child's statement." *In re S.H.W.*, 2016-Ohio-841, ¶ 23 (2d Dist.), citing *State v. Huntley*, 2010-Ohio-6102, ¶ 35 (2d Dist.).

{¶ 97} The event L.Z. reported occurred when she was in fifth grade, and it was warm outside. Tr. at 245-246. Based on the evidence, the State amended the indictment to reflect dates between August 1, 2022 and July 31, 2023. *Id*. at 329 and 333-334. Jocelyn stated that L.Z.'s outburst had occurred in the summer of 2023. There was no indication that L.Z.'s statements were the result of reflection or deliberation or of coercive questioning. Instead, they were spontaneous, and L.Z.'s demeanor starkly contrasted with what Jocelyn had previously seen in her encounters with the girl. Given Jocelyn's description, the trial court did not err in finding there was "a sufficient nexus or inference that could be drawn that the excited utterance was made in conjunction with the unwanted touching." Tr. at 216. Accordingly, the court did not abuse its discretion in admitting the testimony.

{¶ 98} Based on the preceding discussion, there was no error or cumulative error that deprived Bansobeza of a fair trial. The third assignment of error is overruled.

V. Reagan Tokes Act

{¶ 99} Bansobeza's fourth assignment of error states that:

The Trial Court Failed to Advise Bansobeza of His Rights Under the Reagan Tokes Act.

{¶ 100} Under this assignment of error, Bansobeza contends the trial court erred in failing to provide proper Reagan Tokes notifications as required by R.C. 2929.19(B)(2)(c). The State has conceded error, noting that while Bansobeza was sentenced to three life terms without the possibility of parole, he was also sentenced to four non-life terms, which still required the notifications. State's Brief at p. 17, citing *State v. Holland*, 2023-Ohio-4834, ¶ 96-97 (2d Dist.). Because the State has conceded error, the fourth assignment of error is sustained. The matter will be remanded for the court to provide proper notifications under

R.C. 2929.19(B)(2)(c).

## VI. Conclusion

{¶ 101} Bansobeza's first and third assignments of error have been overruled, his second assignment of error has been overruled in part and sustained in part, and the fourth assignment of error has been sustained. Accordingly, the conviction on Count Seven is vacated. The judgment is reversed in part and remanded to the trial court for resentencing with proper notifications under R.C. 2929.19(B)(2)(c). In all other respects, the judgment is affirmed.

. . . . . . . . . . . .

EPLEY, P.J., concurs.

HUFFMAN, J., concurs:

{¶ 102} I concur in the majority opinion but write separately regarding the analysis of the first assigned error, specifically in paragraph 19 relating to the trial court's refusal to admit evidence of Bansobeza's law-abiding nature. Bansobeza's daughters testified as to his peaceful and non-violent nature and also that he was a moral person who treated children appropriately. In overruling the first assignment of error, the majority determined that the trial court erred in excluding evidence that Bansobeza was a law-abiding citizen, but that the error was harmless because such evidence was "cumulative" to the testimony that Bansobeza was a moral person who treated children well. In reaching this conclusion, the majority engages in the strained logic that "*no* person" with high moral character who treats children well would abuse them. This sweeping, generalized assertion is overly broad and subjective. It also lacks evidentiary support, which undermines its utility in terms of legal analysis. The majority needlessly engages in extended logic in this statement that detracts

from the court's obligation to base its decision on evidence and law. I see no error, harmless or otherwise, in the exclusion of the specific testimony that Banzobeza was law abiding, not because no moral person who treats children well would ever abuse them, but because Bansobeza's law-abiding character, especially relative to the attempted rape and GSI offenses discussed in paragraph 19, which involved force, was subsumed by and redundant to the testimony that he was peaceful and non-violent. His daughters' testimony on this subject was thorough and well developed. I concur in the majority opinion in all other respects.